REQUESTED BY: Hobert Rupe, Executive Director
Nebraska Liquor Control Commission
Dear Mr. Rupe:
This is in response to your correspondence of December 22, 2006 and February 5, 2007, in which you requested an opinion of this office regarding the Omaha Tribe's regulation and taxation of alcohol sales on the Omaha Indian Reservation, pursuant to the Omaha Tribe's Alcoholic Beverage Control Title, Title 8 of the Omaha Tribal Code, and whether the City of Pender and certain land near Pender are within the boundaries of the Omaha Indian Reservation.
The Omaha Tribe's Alcoholic Beverage Control Title has various provisions regulating the manufacture and sale of alcohol within the reservation. It is our understanding that the Omaha Tribe has notified manufacturers, importers, wholesalers and retailers that beginning January 1, 2007, said persons must have the appropriate liquor license from the Omaha Tribal Council in order to conduct business on the Omaha tribal reservation. The Title further requires a 10 percent sales tax on retail purchases.
Specifically, you have asked three questions regarding the Omaha Tribe's intention to regulate the sale and distribution of alcohol on the reservation beginning January 1, 2007:
1) What are the Tribe's rights and abilities to regulate alcohol sales?
2) Do the Tribe's actions conflict with Neb. Rev. Stat. § 53-116 and the Twenty-First Amendment of the United States Constitution?
3) Are the City of Pender and certain land near Pender part of the Omaha Indian Reservation?
With respect to these first two questions, since our office cannot give legal advice to private individuals or entities, the scope of this opinion is limited to the effect the tribal ordinance may have on the Liquor Control Commission's ability to regulate the sale and distribution of alcohol on tribal land. As such, this opinion will not provide a legal interpretation of the Omaha Tribe's Alcoholic Beverage Control Title, or express an opinion regarding its validity.
You have asked whether the tribe's intention to enforce Title 8 conflicts with Neb. Rev. Stat. § 53-116 (Reissue 2004) and theTwenty-First Amendment. Section 53-116 provides: "The power to regulate all phases of the control of the manufacture, distribution, sale, and traffic of alcoholic liquor, except as specifically delegated in the Nebraska Liquor Control Act, is vested exclusively in the commission. "
The Twenty-First Amendment repealed Prohibition and returned power to the states to regulate the sale and distribution of alcohol. U.S. Const. Amend. XXI. With respect to the grant of power to the states to regulate alcohol, the Twenty-first Amendment states: "The transportation or importation into any State, territory or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. Amend. XXI Section 2.
There is nothing specific in either § 53-116 or theTwenty-First Amendment which purports to limit the Omaha Tribe from enacting its own tribal ordinance regulating the sale and manufacture of alcohol on the reservation. Indeed, Congress has specifically granted the tribes the authority to regulate liquor transactions in Indian country. §18 U.S.C. 1161. In City of Timber Lake, et. al. v. Cheyenne River Sioux Tribe,10 F.3d 554 (8th Cir. 1993), the court analyzed relevant case law as well as 18 U.S.C. § 1161 and held that said section grants tribes, in addition to the states, the authority to regulate liquor traffic. The court therein stated: "By passing the law codified at 18 U.S.C. § 1161
Congress `delegated authority to the States as well as to the Indian tribes to regulate the use and distribution of alcoholic beverages in Indian country.'" City of Timberlake, supra at 556 (citing Rice v. Rehner, 463 U.S. 713, 715 (1983)). The ordinance adopted by the Omaha Tribe is in addition to, and does not supersede, Nebraska's liquor control laws. This is in accord with 18 U.S.C. § 1161, which provides that liquor transactions on tribal lands must comply with both state laws and tribal ordinances. See generally, City of Timberlake, supra. As a result, the ordinance does not impair the Commission's ability to regulate alcohol.
You have further requested that we address the dispute regarding whether the City of Pender and certain land near Pender are part of the Omaha Indian Reservation. As addressed in Attorney General's Opinion 1026, dated July 23, 2001, it is the opinion of this office that the Omaha Reservation was diminished, either expressly or de facto, by the United States Congressional Acts of August 7, 1882, 22 Stat. 341 ("1882 Act"), February 28, 1899, 30 Stat. 912 ("1899 Act"), May 11, 1912,37 Stat. 111 ("1912 Act"), and the subsequent treatment and character of the disputed territory.
In Solem v. Bartlett, 465 U.S. 463 (1984), the United States Supreme Court set forth several factors to be considered in determining whether Congressional language caused the diminishment of a reservation, but the Court also recognized that de facto diminishment of a reservation may exist regardless of Congress's language or intent. See Solem,465 U.S. at 472
("Where non-Indian settlers flooded into the opened portion of the reservation and the area has long since lost its Indian character, we have acknowledged that de facto, if not de jure, diminishment may have occurred.") Additional considerations in determining whether the Reservation has been diminished are stated in Yankton Sioux Tribe v. Gaffey, 188 F.3d 1010 (8th Cir. 1999), cert. denied 530 U.S. 1261
(2000). In Yankton, the Eighth Circuit Court of Appeals found that when determining whether a reservation has been diminished, it should look to the full historical context of the Congressional acts at issue to determine Congress's intent (and not limit itself to the express language of the acts). Id. The Court further considered, as provided for in Solem, the treatment of the Yankton Sioux Reservation area in the years following the passage of the act, such as the fact that the State had assumed primary jurisdiction over unallotted lands that had passed out of trust status. Id.
In the 1865 Treaty with the Omaha Tribe, the United States Congress provided for the assignment of property to Omaha Tribal members and the discontinuation of the tenancy in common by which the Omaha Tribe was then holding their land. The 1882 Act approved an agreement between the Omaha Tribe and the Secretary of the Interior made in 1880 that authorized the sale to settlers of that portion of the Omaha Reservation to the west of the Sioux City and Nebraska Railroad right-of-way (now the Chicago, St. Paul, Minneapolis, Omaha Railroad ("the right-of-way")).
Thereafter, the 1899 Act authorized the construction and operation of the railroad, and included specific language regarding reversion of the land upon abandonment of the right-of-way. On June 20, 1989, Marcia M. Kimball, for the Field Solicitor of the United States Department of the Interior, interpreted the date of the right-of-way and the language of the reversion to conclude that the right-of-way strip would revert to the adjacent landowner, and not the Tribe, upon abandonment. See Letter to Jerry Jaeger, Area Director, Bureau of Indian Affairs dated June 20, 1989.
Subsequently, the 1912 Act authorized the Secretary of the Interior to sell all unallotted land within the Reservation to the highest bidder. C. 121, 37 Stat. 111. In Chase, Jr. v. United States, 256 U.S. 1 (1920), the United States Supreme Court held that the 1912 Act repealed the 1882 Act (and its 1893 amendment) to the extent that they provided that the trust land that was to be held for the tribe would pass in allotments to children who were born during the trust period. The 1912 Act is particularly significant, because it expressly provided that the laws of the United States prohibiting the introduction of intoxicants into the Indian country would be applicable to the affected land for a period of twenty-five years. Ch. 121, 37 Stat. 111, § 2. Congress did not need to include this provision in the Act if the affected land was to remain within the Omaha Reservation. Thus, their inclusion of this provision in the 1912 Act indicates that it was indeed the intent of Congress to diminish the boundary.
In a detailed analysis of the Omaha Reservation history, Marcia M. Kimball, for the Field Solicitor of the United States Department of the Interior, in her June 20, 1989 letter to Jerry Jaeger, Area Director, Bureau of Indian Affairs, stated that "the land to the west of the right of way went out of Indian control when it was opened for settlement." She further opined that the most probable location for the Omaha Reservation boundary was center of the right-of-way.
The District Court of Thurston County found that the Omaha Reservation has been diminished in its opinion dated August 21, 2000, in State v. Picotte, CR 00-6. Specifically, the Court found that: "the lands lying east of the railroad right-of-way were treated differently from lands lying west of the right-of-way" (Journal 32, p. 366); "[t]he Omaha Tribe did not retain an interest in the lands opened for settlement west of the railroad right-of-way" (Jrnl. 32, p. 366); "the legislative history regarding the passage of [the 1882 Act] demonstrates that Congress intended to diminish the Omaha Indian Reservation west of the railroad right-of-way" (Jrnl. 32, p. 367); "Congress declared in an 1888 Act, that any homestead defaults on land west of the right-of-way would not revert to the Omaha Tribe but be sold at public auction" (Jrnl. 32, p. 367); "the current demographics of the lands west of the right-of-way confirm that the reservation has been diminished. . . [the lands] were settled by non-Native Americans and are currently owned by non-Indians" (Jrnl. 32, p. 367); and the area "is routinely patrolled by State and Village of Pender officers; neither officers of the Tribe nor Bureau of Indian Affairs have provided a law enforcement presence in the opened lands" (Jrnl. 32, p. 368). The Court concluded that the "area west of the railroad right-of-way has lost its Indian character." (Jrnl. 32, p. 368.)
Based on the foregoing, it is our opinion that the property west of the center of the right of way described in the 1882 Act went out of Indian control when it was opened for settlement, and should not be considered part of the Omaha Reservation. We understand, however, that despite the opinion given by Ms. Kimball in her letter dated June 20, 1989, the current United States Department of Interior Superintendent, as well as the Omaha Tribe, may disagree with our opinion regarding the diminishment of the Omaha Reservation. As the determination of reservation boundaries is a federal matter, despite our opinion on this issue, individuals and businesses declining to abide by the Tribe's ordinance or other regulatory efforts in the disputed territory may face personal legal consequences. Thus, in the event that you are contacted by individuals or businesses regarding this Title, you should advise them to seek private legal advice.
In conclusion, in our opinion, the Omaha Tribe's Alcoholic Beverage Control Title does not affect the Liquor Control Commission's ability to regulate the manufacture, traffic, sale and distribution of alcohol on the Omaha reservation. The Commission retains its current regulatory authority to grant or deny liquor licenses and enforce all provisions of the Liquor Control Act on the Omaha reservation. Further, it is the opinion of this office that the property west of the center of the right-of-way described in the 1882 Act should not be considered part of the Omaha Reservation. Since this is an issue of federal law, however, in the event that you are contacted by individuals and businesses in Pender, you should advise them to seek private legal advice.
Sincerely,
 JON BRUNING Attorney General
 Milissa Johnson-Wiles Assistant Attorney General
 Jodi Fenner Assistant Attorney General
 Approved: ____________________________________ Attorney General 16-581-13